**Luke MUCKLEROY**

v.

**OPI INTERNATIONAL, INC. and Offshore Pipelines, Inc.**

**Civ. A. No. G–92–540.**

United States District Court, S.D. Texas, Galveston Division.

Oct. 7, 1993.

938

Ernest H. Cannon, Ernest Cannon & Associates, Houston, TX, for plaintiff.

Chris Andrew Lorenzen, Crain Caton & James, Houston, TX, for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

The instant cause came on for non-jury trial, commencing on September 13, 1993, and concluding on September 14, 1993, the Honorable Samuel B. Kent, presiding. The Court, having carefully considered the oral testimony of all witnesses presented live at trial, the deposition transcript of each witness proffered in that format, all exhibits tendered during the course of trial, all pleadings heretofore filed herein, particularly including the pre-trial order and all relevant attachments, the opening statements and final arguments of each of the parties, as offered through their respective counsel, and the Proposed Findings of Fact and Conclusions of Law submitted by each of the stated parties, and on the basis of a preponderance of the evidence, and pursuant to Rule 52(a), of the Fed.R.Civ.Proc., hereby enters its FINDINGS OF FACT and CONCLUSIONS OF LAW:

### FINDINGS OF FACT

1. Plaintiff Luke Muckleroy commenced this suit on November 9, 1992, asserting a shipboard personal injury, on or about April 5, 1992. Timely responsive pleadings were thereafter filed, by defense interests, and this cause came on for jury trial, on September 13–14, 1993. This Court has jurisdiction pursuant to 46 U.S.C.App. § 688, commonly referred to as the "Jones Act", and Rule 9(h), of the Fed.R.Civ.Proc. Pursuant to such Rule, the cause was tried without a jury. Venue is uncontested.

2. At the time of his injury, in April, 1992, Plaintiff Muckleroy was employed by Defendant OPI International, Inc. as a "Jones Act" seaman, aboard the DB–OCEAN BUILDER, which was owned and/or operated by OPI International Vessels, Ltd. and Defendant Offshore Pipelines, Inc. No action was herein asserted against OPI International Vessels, Ltd., and consequently, that entity is not herein before the Court. Defendants do not contest Plaintiff's "seaman status", or their stated relationships

to the vessel. However, there is considerable dispute as to the precise date of injury.

3. The first Report of Injury or Illness reflects an injury at 0300 hours, on April 7, 1992, with wind out of the south, southeast at fifteen miles per hour, and seas at four to six feet. (Plaintiff's Exh. No. 3). The U.S. Coast Guard Form 2692, Report of Marine Accident, Injury or Death, reflects a nonsensical date of occurrence of May 14, 1990. However, this report also confirms winds out of the south, southeast, at fifteen miles per hour. The wave heights are not listed. (Plaintiff's Exh. No. 4). Relevant excerpts from the vessel's medical log reflect an initial complaint from Plaintiff, at 0750 hours, on April 7, 1992. At that time, Plaintiff complained of left side pelvic pain. The vessel medic, John Johnston, diagnosed "edema and ecchymosis to area of pain on pelvic tilt and rock ...". The medic does not indicate the time of onset of symptoms, or the precise date of injury. (Plaintiff's Exh. No. 5). The vessel's Daily Job Reports, for the relevant time period (Plaintiff's Exh. No. 6), does not reflect the occurrence of an injury, or precise circumstances giving rise to such injury. However, the Court does note the following entry, for April 5, 1992:

2130 Hours  Remove windbreakers and cut scaffold brackets.

2200 Hours  Weather 2TO [sic] Rough to D-rig from P–4/A–2. D-rig sling from 8 part block.

2300 Hours  Stop all welding and break all welding leads to jacket. Inclement weather. High winds and rough seas.

2400 Hours  Standing by due to inclement weather.

During this time, and indeed from 1800 hours of April 5, 1992, through the early afternoon of April 6, 1992, the wind is listed as being out of the southeast, at twenty miles per hour, and the wave heights are listed as eight to ten feet. Conversely, an examination of the Daily Job Report for April 7, 1992, reveals that no weather related delays, or occurrences are recorded in the "Description of Work", and the weather throughout that morning is listed as "fair", with a wind of only ten miles per hour, out of the northeast, and wave heights of two to four feet.

4. The OCEAN BUILDER was being tended, at the relevant time, by Tug ERIC CANDIES. The log entries of that vessel, for April 5, 1992, reflect the following:

1940 Hours  Tow line on stern of OCEAN BUILDER No. 1 and holding into seas.

2400 Hours  BLK306 East Cameron. Tow line on stern of OCEAN BUILDER No. 1 and holding into seas.

This would tend to indicate to the Court that the vessel was encountering rough seas, and keeping its bow into the seas, simply maintaining its place in proximity to the vessel. An examination of the log of the tug for April 6 and 7, 1992, reflect no weather related activities, discernable to the Court.

5. Testimony and medical records surrounding the date of accident are equally murky. Plaintiff initially testified that he was injured on April 5, 1992. However, he then changed his testimony to indicate that possibly the date of injury was April 3, 1992, or even April 7 or 8, 1992. When pressed by his own counsel, he conceded that he really did not remember the date of the accident. Dr. Thomas A. Blackwell indicates that Plaintiff reported to him an injury on April 3, 1992. (Plaintiff's Exh. No. 33). On May 5, 1992, Plaintiff was seen by a Dr. Jerry E. Rogers. Plaintiff reported to him that he was "injured on the job about a month or so ago". (Plaintiff's Exh. No. 43). Plaintiff was also seen by Dr. A.M. Khatari, on May 5, 1992. Plaintiff also gave him a history that he had been injured at work "about four weeks ago". (Plaintiff's Exh. No. 44). Dr. Richard K. Simpson, Jr. also treated Plaintiff. Dr. Simpson determined that Plaintiff was "in his usual state of good health until approximately the 10th of April of this year [1992], when, while working on a ship, [he was injured]." (Plaintiff's Exh. No. 46).

6. Charles Smith, the Defendant's Derrick–Barge Superintendent, on duty during the relevant time period, testified that he was uncertain as to the precise date of the accident. He did concede that the vessel experienced very inclement weather on the evening of April 5, 1992, and that the vessel had to shut down operations for several hours. It was his recollection that this was a

few hours before Plaintiff was injured, but he could not say exactly how long. Charles Tunnel, a former OPI rigger, and now a self-employed remodeler, testified that he was in the work basket with Plaintiff, at the time of his injury. He testified that the weather conditions were extremely rough, and that the vessel was rocking as much as fifteen feet. The basket in which they were working was swinging on a wide arc, and he felt the situation was manifestly dangerous. He did not opine a date of accident, but the Court notes that the conditions described by him are applicable according to the testimony of Mr. Smith, and the vessel's log, only to the late hours of April 5, 1992, as opposed to the relatively modest conditions prevailing on April 7, 1992. Although the testimony of the Plaintiff and Witness Tunnel differ slightly from the testimony of Derrick–Barge Superintendent Smith, as regards the scope of movement of the basket and vessel, in heavy seas, all agree that the conditions prevailing at the time of Plaintiff's injury were relatively severe. Consequently, after a careful examination of each and all of the exhibits offered into the Record, as well as the testimony of witnesses presented live at trial, and the records of the stated treating physicians, the Court finds that Plaintiff was injured during the very late hours of April 5, 1992, or the very early morning hours of April 6, 1992. At this time, the Court finds that the winds were in the range of twenty miles per hour, and the seas were eight to ten feet. Only such conditions, during the relevant time period, could have produced swinging of the basket conceded by all of the witnesses to this casualty.

7. The OCEAN BUILDER is classified as a "Heavy Lift Crane Vessel", with an overall length of 640 feet, an extreme width of 120 feet, and a gross tonnage of 11,930.86 tons. She was built in 1956, but has been refitted, to perform heavy drilling operations. She is equipped with a 2,000 ton heavy lift crane, and smaller cranes, and she has operated primarily in the Gulf of Mexico, for the last ten to twelve years. (Plaintiff's Exh. No. 4). During early April, 1992, she was operating in Cameron Block 306, off the coast of Louisiana. (Plaintiff's Exh. No. 3). The vessel was in the process of drilling a well for Enron Oil & Gas. As of April 5, 1992, the vessel had been on the job for three days, such being Job. No. 8634. The vessel was in the process of placing a platform, and affixing it to the seabed. This was done by means of stabbing pilings inside the rig legs, to fix the rig in place. (Plaintiff's Exh. No. 6).

8. The stabbing of the pilings is accomplished by pile driving each leg pile in sections. A certain amount of depth of each pile is achieved, and then the hammer is removed, and a new section is first tacked and then welded onto the pile. This in turn is driven to a specific depth, and another section is attached. This is done in sequence, until the necessary length of piling has been driven, to fix the rig leg in place, on the sea bed. As each new section of pile is attached, it is necessary to move the pile section with a sling and shackle arrangement. Obviously, after the new section of pile is firmly welded to the driven section, the slings and shackles must be removed, to reattach the pile driver.

9. During the afternoon of April 5, 1992, and through the early evening hours, these operations were proceeding without difficulty. (Plaintiff's Exh. No. 6). However, by 1405 hours, rain had shut down the welders, and work was not recommenced until 1455 hours. Work then proceed without apparent difficulty until 2200 hours. As stated above, the weather rapidly deteriorated, during the early and mid-evening hours, until the stated 2200 hours, when operations were brought to a complete standstill. (Plaintiff's Exh. No. 6). Apparently, during this time, an attempt was made to send men aloft in a work basket. This basket was approximately three feet by ten feet, and is not a traditional "donut-ring" personnel basket complete with netting and safety devices. Instead, it is a simple platform, with railing extending up a few feet, from the decking. This allows 360 degree access to work, and manipulation of tools and the like, without encumbrance from safety netting, lines, or the like. Unfortunately, it is not a particularly safe mechanism. The intention was to have the men in the work basket unhook the sling and shackles from the top of the newly attached pile section. This work was being done in excess of eighty

feet into the air. The operation was under control of Deck Foreman Ken Best. He had been a longtime crane operator, offshore, but this was his first assignment as a deck foreman. This was also his first exposure to heavy weather, as a deck foreman.

10. The first attempt to unhook the sling and shackles was a failure. Indeed, the men in the work basket were literally screaming, because of the radical swing of the basket. Plaintiff estimated the swing to be as much as forty feet in each direction, for a total arc of roughly eighty feet, but the Court surmises that it was probably less than that, although significant to the men in the basket. In any event, when the basket was brought back to deck, at least one, and possibly two of the men, simply refused to go back aloft, citing the profound danger of the operation. At this juncture, Foreman Best awakened Derrick–Barge Superintendent Charles Smith, and informed him of the situation. Superintendent Smith then attended upon deck, to assist in the situation. At least one tag line was affixed to the basket, and some sort of restraining line was also attached, although not to an electric tugger, which would have had the effect of severely limiting the basket's movement. Superintendent Smith indicated that the tugger was not used because it might render the restraining line sufficiently inelastic as to cause the parting of that line, and a whiplash motion of the basket, which would be more dangerous than its loose swing. In any event, a second try was made, which was equally unsuccessful. It was unclear as to whether Plaintiff was injured on this trip, or the third trip. On the basis of the totality of oral testimony, from each of the witnesses brought to trial, and the Plaintiff, the Court finds that Plaintiff was injured on this second attempt. At that time, Plaintiff and several other men were in the work basket. The basket was hoisted aloft, and although slightly restrained by the attached line, continued to swing widely. No lines had been attached to the basket sufficient to keep it away from the pile, and on one swing, the basket crashed into the pile, causing Plaintiff's low back to impact the railing, in the area of his mid-low back, and his head and neck to strike the pile itself. He was dizzy, and hurt "all over". He was

not knocked unconscious. No one else in the basket was apparently hurt, although witness Charles Tunnel testified that he had bumps and bruises "all over him", on the next day. Indeed, he felt sufficiently badly after the incident, that he laid off one-half of the next day. Of critical importance, the Court notes that the second attempt was as unsuccessful as the first. Indeed, a third attempt was made, but on this occasion, the shackle itself was unhooked from the crane block, and was apparently retrieved later. This allowed for a successful detachment, at considerably less risk than the first two attempts, and should have been tried the first time.

11. Also of importance, Derrick–Barge Superintendent Smith testified that a completely safe alternative to this entire scenario would have been the use of "chain elevators". This is a mechanism that is attached, by means of a welded padeye, and chain harness, to the pile section, before it is driven. At the appropriate time, the elevator mechanism is utilized to quickly retrieve shackles and sling from the top of the driven pile. The Court notes that chain elevators were used several other times during the relevant time period of April 5–7, 1992. (Plaintiff's Exh. No. 6). Moreover, while it takes about an hour to an hour and one-half to attach chain elevators, the total cost of this operation, inclusive of man hours for all personnel utilized, and down time for the rig, is something less than $3,100.00. As the chain elevators were used on several other occasions, during the relevant time period, and constitute a de minimis cost to the owner, the Court finds that the failure to utilize chain elevators in the present circumstances, where the weather was deteriorating over a period of several hours, and the actual use of an improperly secured work basket constituted an unreasonable risk of danger to the crew members, therefore constituted manifest negligence.

12. On the basis of the testimony of the witnesses who appeared at trial, as well as a complete review of the document admitted into the Record, the Court finds that the weather had begun deteriorate in the early afternoon hours of April 5, 1992, and indeed, by 1800 hours of that date, seas had climbed

to eight to ten feet. (Plaintiff's Exh. No. 6). Indeed, even Defendants' liability expert, Marine Engineer Penn Johnson, conceded that any attempt to conduct operations in seas of this height would be dangerous, as the vessel's crane boom would be swinging widely, in such seas, and any basket attached to the block of such a crane would be swinging dramatically. Plaintiff's liability expert, Marine Surveyor Joe Grace, testified that the overall operation was manifestly unsafe.

13. Curiously, Defendants' liability expert Johnson also tends to corroborate the date of casualty as being in the late evening hours of April 5, 1992, or the early morning hours of April 6, 1992. He emphatically testified that the conditions described by all of the eyewitnesses to the incident simply could not have been possible on the morning of April 7, 1992, when the seas were only two to four feet, and the wind was only ten miles per hour. Indeed, it would take much heavier seas, in fact seas coming perpendicular to the bow, to cause the roll of the vessel sufficient to generate crane and basket swing in the range described. Therefore, on this basis, as well, the Court finds that the accident occurred, as stated above, during the late evening hours of April 5, 1992, or the early morning hours of April 6, 1992.

14. The Court finds that Defendants were negligent: in failing to adequately monitor the weather conditions, to ensure timely precautions, such as the attachment of a chain elevator, to safely retrieve the sling and shackles; in failing to provide adequate on-site management, through Foreman Best, to reasonably plan the operation in contemplation of the safety of the men being sent aloft; in failing to provide adequate remedial managerial intervention, through Derrick–Barge Superintendent Smith, to intercede with an eye toward safety, in attempting to remove the shackle from the block, first, as opposed to the much more dangerous operation of sending men in a widely swinging work basket in close proximity to a large, affixed and dangerous pile; and in persisting with the sending of the work basket aloft, in circumstances where at least one or two men had refused to go aloft because of the conditions, and where inadequate precautions

were taken, such as the affixing of the electric tugger, or other devices, or additional lines, to guarantee stability of the work basket, to prevent its swinging into the pile.

15. The Court finds that such negligence proximately caused injury to Plaintiff. He reported the injury promptly to the vessel's medic, John Johnston. Medic Johnston determined that Plaintiff had sustained bruising and swelling all across his low back, and that he had significant shoulder, neck and back complaints. Plaintiff conferred with Medic Johnston three times, before leaving the vessel. Within a day or two of his return home, he had reported to doctors, and gave consistent versions of the accident, specifically that he was in a work basket which was raised up in heavy seas, and the basket swung into a piling, causing him to strike his low back against the basket rail, and his head and neck against a pile.

16. The Court finds that Plaintiff, himself, was not negligent to any extent, in bringing about his own injury. Plaintiff testified that he felt he had to go back aloft, in the work basket, because he had been told to do so by Foreman Best, and feared that he would lose his job if he refused. He conceded that others refused to go up, and that they were not fired, but this is hindsight. He did not have that knowledge at the time he made his decision. Derrick–Barge Superintendent Smith indicated that no one would be fired for refusing to go aloft. However, he did not contest Plaintiff's allegation that Foreman Best instructed Plaintiff to return aloft. Witness Tunnel testified that he too was instructed to go aloft, and also feared losing his job. Indeed, his apprehension was not misplaced. Relatively shortly after the accident, he and a number of other riggers were laid off. However, of paramount importance, the Court notes the testimony of both Witness Tunnel and Derrick–Barge Superintendent Smith, that Plaintiff could not be faulted for his return aloft. Indeed, not only Plaintiff's liability expert, Captain Joe Grace, but also Defendant's liability expert, Marine Engineer Penn Johnson, conceded that Plaintiff could not be held at fault, for his injury. In the circumstances, the Court finds no negligence, on the part of Plaintiff.

17. On the other hand, the Court finds that Plaintiff has also asserted claims for unseaworthiness, and gross negligence. The Court finds no basis for these contentions, in fact. No evidence was offered in the trial of this cause to indicate that any item or appurtenance of the vessel failed to perform its intended purpose, or that any such item or appurtenance was unreasonably unfit for such purpose. Consequently, the Court finds that the vessel was seaworthy, in all respects, at the time of this casualty. Similarly, the Court finds that there is no basis to assess punitive damages, in this case. While the Court does find that the Defendants were negligent, and one hundred percent (100%) responsible for Plaintiff's injuries, the Court does not find that such negligence rises to the level of conscious indifference to the safety and well being of the crew, or a desire to inflict intentional harm. Simply put, some bad judgment calls were made on the evening in question, that gave rise to Plaintiff's injuries. This is an unfortunate situation, for which the Defendants are responsible. Nevertheless, no items or equipment aboard the vessel were defective, in causing or bringing about the casualty in any way, and no members of the crew exhibited such callous or wanton disregard for Plaintiff's safety as to rise to the level of gross negligence.

18. Plaintiff has been seen by several doctors, since his injury. He was first seen by Dr. Anthony Jorgenson, who had treated him for prior medical problems, some years ago. Dr. Jorgenson is a Board Certified orthopedic surgeon, who treated Plaintiff for his low back injury. Plaintiff was then referred by Dr. Jorgenson, to Dr. Abdul Khatari, a Board Certified neurologist. Dr. Khatari treated Plaintiff, for all of his spinal and related injuries. However, upon determination that Plaintiff had apparently significantly cervical disc problems, at C4–5, and C5–6, Dr. Khatari referred Plaintiff to Dr. Richard K. Simpson, a Board Certified neurosurgeon, for cervical disc surgery.

19. Dr. Jorgenson had an MRI performed on Plaintiff, on May 4, 1992, within just about one month of Plaintiff's stated injury. This exam revealed disc "desiccation", at L3–L4, and L5–S1. Exterior disc bulging was present at both levels. There was narrowing of thecal sac, throughout the lower lumbar canal. ((Plaintiff's Exh. No. 43). Dr. Khatari testified that the significance of this test is that Plaintiff's stated lumbar vertebral discs were "withered". In other words, the interior of the disc, the nucleus pulposus, had extruded through the annulus fibrosis, literally draining the fluid component through the disc, and causing the disc to compress. He indicated that this can occur naturally, over time, with severe strenuous work, and arthritic and degenerative changes in the spine, and it can also occur from traumatic inducement, such as the injuries testified to by Plaintiff. He testified that on the basis of reasonable medical probability, it would be physically impossible to determine from the MRI, as to which of these two scenarios had occurred to Plaintiff's back. However, most likely, he concluded that Plaintiff may have had some preexisting problems with his back, but that the stated injury, of April 5, 1992, clearly caused exacerbation and consequent problems with the low back. He testified that Plaintiff will be subject to "chronic low back syndrome", meaning that he will have a painful and symptomatic low back probably for the rest of his life. Both he and Dr. Jorgensen ruled out any surgical intervention, at this time. The lumbar spine is stable, and in place, and does not show sufficient evidence of nerve root impingement to justify surgery. Indeed, he testified that surgery, with conditions such as those present in Plaintiff's back, frequently gives rise to more pronounced problems than it corrects. As a consequence, neither he nor Dr. Jorgensen recommend surgery to the low back, although both concede the Plaintiff will have problems for the rest of his life, in this area. He also could not absolutely rule out the possibility of further surgery, should Plaintiff's low back become unstable.

20. As noted above, Dr. Khatari had further MRI studies done, to Plaintiff's upper spine, and determined the presence of significant herniation of the disc at C4–5 and C5–6. These were accompanied by pronounced numbness and tingling and other nerve root impingement symptoms, to indicate that Plaintiff's neck injuries were much

more severe. On that basis, he referred Plaintiff to Dr. Simpson, for surgery. A discectomy was performed at C5–6, which has significantly helped with Plaintiff's subjective problems. This surgery was performed in May, 1992, and has been convalescing for approximately sixteen to seventeen months, at this time. Plaintiff concedes significant improvement. However, there has been a disturbing recent development. Plaintiff has again began to experience numbness and tingling and discoloration in his arms and hands. This has been verified by Dr. Khatari, and indeed, Plaintiff is shortly scheduled to return to Dr. Khatari for further MRI studies. Dr. Simpson presently feels that Plaintiff is in relatively good condition and does not appear to presently need additional neck surgery. (Plaintiff's Exh. No. 49). However, Dr. Khatari testified that Dr. Simpson simply means that Plaintiff cannot justify surgery, at the present time. He feels that although one disc was fixed in the cervical area, previously, it is likely that the unrepaired disc is now causing sufficient nerve root impingement to manifest Plaintiff's stated complaints. He testified that Dr. Simpson was completely correct in only repairing one disc, at the time of the May, 1992 surgery. He stated that double disc surgery is very traumatic, and indeed the better course is to be slightly conservative. He agreed that repairing one disc, and seeing how that went, would give a good indication of the likely treatment modality required for the second disc. On the other hand, prior surgery clearly left one diagnosed, herniated disc, in his cervical spine, which is now manifesting observable symptomatology. On that basis, he now feels that Plaintiff will require a second cervical operation, in the near future, and although Plaintiff is reluctant to have it, feels that it may be absolutely mandated, if his symptoms become more pronounced. He estimated that the approximate cost of that surgery would be anywhere from $15,000.00 to $20,000.00, and consequently the Court finds that the fair and reasonable value of that subsequent, reasonably, medically probable surgery would be $17,500.00.

21. Dr. Khatari also testified that notwithstanding the possibility of further neck surgery, Plaintiff will continue to have significant symptomatology with regard to his low back, as well as his neck and shoulders, throughout the rest of his life. On this basis, he testified that Plaintiff will undoubtedly require analgesic care in the range of $1,000.00 to $2,000.00 per year, for medication, episodic therapy, and related conservative modalities, for the rest of his life. The Court finds, consequently, that a fair and reasonable estimate of Plaintiff's future medical expenses would be in the range of $1,500.00 per year. According to U.S. Life Tables, uncontested at trial, Plaintiff has a life expectancy of 74 years. He is presently 42 years of age. Consequently, he will need this treatment for approximately 32 more years.

22. Plaintiff complains of profound, subjective problems, through the present date. His neck and shoulders hurt. He has numbness, tingling and discoloration, and reduced strength, in his upper extremities. He complains of periodic hip and leg pain, and severe discomfort in his low back. He has difficulty stooping, standing, or moving about. He tries to walk several times a day, but this causes discomfort. He has a great deal of difficulty sitting for long periods of time. He testified that when he stands for more than ten minutes at a time, he "breaks into a sweat". Defendants make much of the fact that Plaintiff is a heavy man, weighing in excess of 250 pounds, and being approximately six feet tall. However, Plaintiff emphatically testified that he weighed less than 200 pounds, at the time of his injury, and has always tried to maintain himself in superb physical condition, as he considers himself to be a "ladies' man". He testified that he is profoundly embarrassed, by his post-injury weight gain, and that he simply cannot successfully lose weight, because he can do virtually no exercise, to assist him in any diet regimen. He hurts all the time, has profoundly diminished self-esteem, and has been, in the Court's view, profoundly injured, both physically and emotionally. He has sustained traumatic injury to two cervical discs. He has sustained at least significant exacerbation injury to two lumbar discs. He has permanent, significant and disabling injuries

and he faces at least one significant surgery, in the short term, and a lifetime of subjective problems, limitations, pain and discomfort.

23. Virtually all of Plaintiff's doctors have precluded him from returning to sea. He is simply excluded from heavy work, or significant lifting, bending, stooping, climbing, or other vigorous activity. Virtually all of his doctors agree that he certainly can be employed in some capacity, and that he is capable of sedentary to light work, assuming availability of reasonable movement, flexible hours, and limitations on necessary climbing, stooping, bending and lifting. He has a high school degree, and some vocational and on-the-job training. He has worked hard all of his life, but frankly, the Court observes that most of his work has involved his back and his hands. He is a straight-forward, pleasant and credible witness. However, the Court frankly observes that he has a great deal of difficulty orally expressing himself, demonstrating relatively little memory capacity, and that he is not what might be construed as an academically intellectual individual. The Court certainly finds that he was capable of leading a happy and productive life style, prior to his injury. Moreover, the Court is equally convinced that Plaintiff can be retrained, and that he can do some meaningful work. On the other hand, Plaintiff is clearly not a candidate for "white-collar" work, management, or other work obligations requiring extensive or rapid thought processes.

24. Defendants make much of the fact that Plaintiff was recommended by his own doctor, Dr. Khatari, to contact the Texas Employment Commission, or the Texas Rehabilitation Commission, and to seek retraining and work. Plaintiff testifies that he simply hurts too much to pursue this work, and he readily concedes that he has not followed up on these instructions. He does not, at the present time, feel that he can do anything. He testified that he would certainly like to return to work, and feels very badly that he cannot do the kinds of things he used to do, particularly including farm work, riding horses, and the like. On the other hand, he shows no taste whatsoever for the sort of alternate employment suggested by Defendants, such as delivering pizzas, cooking in a Dairy Queen, serving as a salesman in various capacities, or other jobs of like nature. Indeed, the biggest impediment to retraining Plaintiff will be, in the Court's view, a reorientation of his self image, in conformity with his present physical limitations. Plaintiff has taken this injury very hard, and he will not easily recover from it.

25. Defendants presented professional vocational rehabilitation counsellor Judith Lide, at trial. Ms. Lide is an obviously professional and competent individual, possessed of great poise and a likeable demeanor, as a witness. On the other hand, the Court frankly felt that the overwhelming bulk of her testimony was totally without merit. Ms. Lide suggested five general areas of work available to Plaintiff, in the greater Nacogdoches, Texas area, where he now lives. The first job was a pizza delivery job. This pays $6.00 to $8.00 per hour, and requires that the employee provide his or her own vehicle, and insurance, and pay all of his or her own expenses, such as gas, oil, vehicle maintenance and the like. It provides no "fringe benefits". The job is extremely time intensive, requiring delivery of pizzas within thirty minutes of an order, and requires extensive driving, sitting, standing, moving in and out of vehicles, walking up steps to apartments or houses, and manipulation of light to medium loads, such as stacks of pizzas, soft drinks and the like. Although the Court readily concedes that such work is likely available, the Court is simply mystified as to how this might apply to the Plaintiff, who faces pending neck surgery, has profound physical limitations, has gained almost sixty pounds since his accident, is capable of virtually no physical activity except sitting and walking around the house, and who has great difficulty driving, because of the pain involved.

Ms. Lide also suggested work as a manager-trainee at a Dairy Queen, which would require standing throughout an eight hour-a-day shift, and extensive dealing not only with the public, but other employees, financial matters, purchasing, and a host of other administrative responsibilities. She also suggested three jobs, respectively, in manager-

training, interior sales and financial services work. However, of critical importance, on cross examination, Ms. Lide expressly confirmed that she personally contacted each of the prospective employers, in the stated areas, and absolutely *none* of them had any employment available, at the time she contacted them. Indeed, except for pizza delivering, she was unable to indicate a single job available to someone with Plaintiff's background and work credentials, in the greater Nacogdoches, Texas area.

Moreover, Ms. Lide conceded she has never met Plaintiff, and has never even talked to him, in making this job assessment. Had she spent a little time with him, the Court is firmly convinced that she would hardly see him as a candidate for management, or extensive training, involving computers, and equivalent equipment. Indeed, on the basis of the Court's observation of Plaintiff, throughout the two-day trial, and a careful review of the records and testimony of other witnesses, the Court finds the suggestion that Plaintiff could be employed as a manager or other sophisticated administrative worker is sufficiently without merit as to be frankly ridiculous. Moreover, the Court is troubled with the general thrust of the Defendants' contentions. As the Court understands it, Defendants are suggesting that Plaintiff is somehow at fault because having had his entire life style taken away, with severe and pronounced resultant spinal injuries, he has not taken the responsibility to go out and accept meaningless and menial alternative employment, in the face of genuine physical limitations and pain, simply to offset their obligation to reimburse him. This is a manifestly callous and perverse perspective. At no time throughout the trial, despite frankly not even vigorously contesting liability, did the Defendants indicate any willingness to accept responsibility for Plaintiff's injuries, or to express any sense of compassion for his consequent plight. The Court certainly agrees that at some point, in the relatively near future, if for nothing else than his own emotional well-being, Plaintiff is going to have to pick up the wreckage of his life, and do the best he can to fashion a reasonably happy residual existence. However, to suggest that he is somehow responsible for not racing out to the privilege of delivering pizzas in his own car, or flipping hamburgers for eight hours a day in a Dairy Queen, when his entire life's training and work experience have been stripped from him, is simply astonishing.

26. Plaintiff presented, at trial, Dr. Thomas Mayor, as his economist. Dr. Mayor received his Ph.D. from the University of Maryland, in 1965, in economics, and has been employed, for the last twenty years, as a professor of economics at the University of Houston. Dr. Mayor examined the Plaintiff's employment records, income tax returns, Social Security Administration earning records, and other relevant information. On the basis thereof, he testified that as of the date of Plaintiff's injury, on April 5, 1992, he had a net actual earning capacity of $27,249.00. The Court finds this assessment to be fair and reasonable, and accepts such. Dr. Mayor also testified that to this base wage capacity should be added $1,680.00, to cover the value of "fringe benefits" available to Plaintiff, at the time of his injuries, including life insurance, health insurance, profit sharing and other modest benefits. Dr. Mayor also testified that Plaintiff is now having to perform work around the house that he used to be able to retain others to do, and the reasonable value of this work, pro-rated in terms of the number of hours actually available to do such work, given Plaintiff's previous work history, times the minimum wage of $4.25 per your, for the payment of modest replacement labor, would equal $3,102.00. Dr. Mayor also determined that the reasonable value of meals provided aboard the vessel, to Plaintiff, which are of course not provided to him in his present circumstances, at the extremely modest rate of $6.00 per day, would equal $1,460.00 per year. The Court finds each of these calculations to be completely fair and reasonable, and consequently, the Court finds that Plaintiff will sustain, in the future, a maximum, theoretical yearly economic loss of $33,491.00.

Plaintiff will also be required to incur, as found above, approximately $1,500.00 per year, in out-of-pocket medical expenses, to deal with his residual physical problem. This means that Plaintiff will have total theo-

retical gross economic losses, on a yearly basis, of $34,991.00. Dr. Mayor found that when this figure is discounted, to allow for taxes, social security contributions, and related deductions, including the saving of expenses which would have been incurred if Plaintiff continued to work, Dr. Mayor found that Plaintiff will sustain an annualized net loss, in the future, of a maximum of $29,-960.00 per year. Extending this loss to age 65, and utilizing the appropriate inflationary adjustments, and discounting to present cash value, mandated by prevailing Fifth Circuit authority, Dr. Mayor determined that using a 1.25 percent (1.25%) annual discount rate, Plaintiff's total future net damages would equal $801,252.00, and using a 1 percent (1.00%) annual discount rate, such future total net losses would equal $671,052.00. Multiplying Plaintiff's future medical expenses of $1,500.00 per year, times his work life expectancy, and applying the same discounting, would yield a range of $48,144.00, to a maximum of $62,319.00.

On the other hand, Dr. Mayor also found that assuming that Plaintiff could return to work, in some capacity, at the rate of $6.00 per hour, (which is the only realistic wage for the one job Ms. Lide testified would even be available to Plaintiff, assuming he is physically capable of doing anything), and projecting that $12,000.00 deduction, or $6.00 per hour times 2,000 work hours per year, Dr. Mayor further opined that Plaintiff could offset his potential future economic losses with mitigating wages ranging from $256,851.00, to a maximum of $309,014.00. When Plaintiff's future net economic losses and future medical expenses are added, and the potential mitigation wage is deducted, Dr. Mayor testified that Plaintiff will, in reasonable economic probability, lose in the future a minimum of $462,345.00, and a maximum of $554,520.00. The Court finds that the middle range of these two figures, or $508,451.00, is a fair and reasonable estimate of Plaintiff's future net economic losses. This assumes that Plaintiff will not have sufficient medical problems as to preclude full work during each and every year of his remaining work life expectancy, at a relatively modest wage of $6.00 per hour, with minimal fringe benefits, or in the alternative, that assuming Plaintiff does have surgery, and certain periods of protracted convalescence, that he will indeed, over time, be able to work at least significant portions of each year remaining in his work life expectancy, and at a potentially higher wage. In either event, the Court finds that figure is a fair and reasonable estimate of his future losses, taking into consideration the extent of his physical injuries, his intellectual capabilities, and the likelihood of his future employment. This figure also imposes upon Plaintiff a firm obligation to return to work, and the Court assumes that this obligation will be met. Without such mitigating ability, his economic loss in the future, as noted above, would obviously be considerably higher.

The Court notes that Defendant' economic expert, actuary Fred Bass, opined a much smaller future loss. However, the Court finds that his opinions incorporate a number of assumptions regarding future earning capacity that are wholly unsupported by the evidence, and a discount factor of 3% per annum, which is in excess of that allowed by prevailing Fifth Circuit authority. Taken in context, the Court finds Mr. Bass' testimony incredible, and wholly disregards it.

27. The Court finds that on the basis of Plaintiff's annualized earning and economic capability, and on the basis of Dr. Mayor's testimony, that Plaintiff has fairly and reasonably lost, from date of injury, through date of judgment, $4,449.00 in past lost household services and related expenses, and $36,352.00, in total economic losses and expenditures, totaling $40,801.00. This loss is not controverted by Defendants' actuary, Mr. Bass.

28. The Court also finds that Plaintiff will, as found above, require additional cervical surgery, the reasonable cost of such being estimated by Dr. Khatari as $17,500.00. As stated above, the Court finds this figure as a fair and reasonable amount to compensate the medical probable likelihood of Plaintiff's future cervical surgery.

29. Finally, the Court addresses Plaintiff's subjective losses. Plaintiff has already undergone one significant cervical surgery. He faces another. He has gained in excess of sixty pounds, but has conversely

been rendered a "shadow" of his former self, in terms of work abilities, mobility, and consequent self-esteem. He has made reasonable efforts to convalesce, but has been precluded from returning to active work, and will likely be so precluded for a reasonable time into the future. Even when he does return to work, it will be in an area which Plaintiff would never have voluntarily selected, and the Court has absolutely no doubt, on the basis of Plaintiff's own testimony, and the testimony of all of his treating physicians, that he will have significant, pronounced and problematic physical limitations throughout the rest of his life. He will probably be relegated to a medication regimen, and episodic therapy regimen, continued subjective complaints and limitations, throughout each and every day of the rest of his life. His injuries, both to his lumbar spine, (in exacerbation of pre-existing problems), and to his cervical spine, are pronounced and significant. They are disabling, and permanent. On the totality of the evidence offered in this case, and after careful consideration of the relevant testimony of each of the presented witnesses, and the records adduced at trial, the Court finds that a fair and reasonable amount to compensate Plaintiff's past pain and suffering, mental anguish, physical infirmity and disfigurement, equal $125,000.00. The Court also finds that a like amount, of $125,000.00, is fair and reasonable to compensate the subjective losses which Plaintiff will suffer throughout the remainder of his natural life. Consequently, the Court finds that Plaintiff's subjective losses should be compensated in the total amount of $250,000.00.

30. The Court finds that Plaintiff is entitled to pre-judgment interest, at the rate of 3.5 percent per annum, relative to subjective losses and actual losses, he has sustained to date. Totalling Plaintiff's previous economic losses of $40,801.00 and his subjective previous losses of $125,000.00, over a period of 18 months from the date of accident through date of Judgment, the Court finds that the interest due and owing on such amount equals $8,082.80. The Court finds that Plaintiff shall also have post-judgment interest, until payment in full of such outstanding Judgment, also at the rate of 3.25 percent (3.25%) per annum.

31. In consequence of all of the foregoing, the Court finds that Plaintiff has sustained total damages in the amount of $824,834.80. Defendants are jointly and severally 100 percent (100%) negligent in this case, and the Court finds no negligence on the part of Plaintiff. Consequently, the Court finds that Plaintiff is entitled to and shall have and recover of and from Defendants the stated amount, of $824,834.80, together with interest thereon at the rate of 3.25 percent (3.25%) per annum, from date of Judgment, until satisfaction thereof, as well as taxable costs of court, as provided by law.

### CONCLUSIONS OF LAW

1. At the time of his injury on April 5, 1992, Plaintiff Luke Muckleroy was a "seaman", as that term is defined in law. 46 U.S.C.App. § 688. This Court has jurisdiction pursuant to the "Jones Act", 46 U.S.C.App. § 688, and Fed.R.Civ.Proc. 9(h). Venue is uncontested.

2. The injuries sustained by Plaintiff Luke Muckleroy, as described in the Court's Findings of Fact, were proximately caused by the negligence of Defendants OPI International, Inc. and Offshore Pipelines, Inc., and such negligence was a legal and factual cause of Plaintiff's injuries. *Kanishcher v. Irwin Operating Co.*, 215 F.2d 300, 303 (5th Cir.1954), *Cert. Den.* 348 U.S. 942, 75 S.Ct. 363, 99 L.Ed. 737 (1955). Consequently, Defendants are completely liable, jointly and severally, to Plaintiff for his damages sustained as a result of the subject incident, including loss of wages and benefits in the past and loss of net future earning capacity, reasonable costs of necessary medical and hospital care in the future, physical pain and suffering including physical disability, impairment, inconvenience, the effects of Plaintiff's injuries upon the normal pursuits and pleasures of life, and mental anguish, both past and future, and past and future loss of household services. *See Williams v. Chevron*, 875 F.2d 501, 506 (5th Cir.1989). The future losses must be discounted. *Culver v. Slater Boat Co.*, 722 F.2d 114, 117 (5th Cir.1983). Future lost income must also reflect adjustment to net, after-tax value.

**950**

*Norfolk and W. Ry. v. Liepelt,* 444 U.S. 490, 493–94, 100 S.Ct. 755, 757, 62 L.Ed.2d 689 (1980).

3. This was an admiralty action tried without a jury, pursuant to the Court's admiralty jurisdiction, invoked by Fed.R.Civ.Proc. 9(h). Accordingly, an award of interest is proper in the sound discretion of the Court. *Marathon Pipe Line Co. v. Sea Level II,* 806 F.2d 585, 593 (5th Cir.1986). The Court finds that an award of pre-judgment interest is proper in this case, at the rate of 3.25% per annum, on Plaintiff's past damages, as provided and described in the Court's Findings of Fact.

4. On the basis of the foregoing Findings of Fact, Plaintiff has sustained damages in the amount of $824,834.80, inclusive of all past and future losses, pre-judgment interest or past losses, together with interest on the entire Judgment, until satisfied, at 3.25% per annum.

5. To the extent any finding of fact constitutes a conclusion of law, the Court hereby adopts it as such. To the extent any conclusion of law constitutes a finding of fact, the Court hereby adopts it as such.

**IT IS SO ORDERED.**

### *FINAL JUDGMENT*

For the reasons set out in the Court's Findings of Fact and Conclusions of Law, entered this date, in the instant cause, and pursuant to Rule 58 of the Fed.R.Civ.P., Judgment is hereby rendered in favor of Plaintiff, on his claim of "Jones Act" negligence. Pursuant hereto, Plaintiff Luke Muckleroy shall have and recover of and from Defendants OPI International, Inc. and Offshore Pipelines, Inc., jointly and severally, the total amount of $824,834.80, together with his taxable costs of court, and post-judgment interest at the rate of 3.25 percent per annum, for which let execution issue, if not timely paid.

Plaintiff's claims of unseaworthiness and gross negligence are without basis in fact and it is consequently ORDERED that each of such claims is hereby **DISMISSED WITH PREJUDICE.** ALL RELIEF NOT HEREIN EXPRESSLY GRANTED IS DENIED.

**THIS IS A FINAL JUDGMENT.**