**Laurie MORENO, Plaintiff,**

v.

**GRAND VICTORIA CASINO, Defendant.**

**No. 98 C 336.**

United States District Court, N.D. Illinois, Eastern Division.

March 3, 2000.

---

Dennis M. O'Bryan, Kirk E. Karamanian, O'Bryan, Baun & Cohen, Birmingham, MI, Frederic A. Mendelsohn, Lauren A. Lundin, Schoenberg, Fisher, Newman & Rosenberg, Ltd., Chicago, IL, for Plaintiff.

Kimbley Ann Kearney, Clausen Miller P.C., Chicago, IL, for Defendant.

## MEMORANDUM AND ORDER

MORAN, Senior District Judge.

Plaintiff Laurie Moreno (Moreno) sues her former employer, Grand Victoria Casino (Grand Victoria), for negligence and unseaworthiness under the Jones Act, 46 U.S.C.App. § 688 *et seq.*, and general maritime law, and for retaliatory discharge in violation of general maritime law and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.* On September 2, 1998, we awarded plaintiff retroactive maintenance and cure for the knee injury she sustained while refilling a slot machine in defendant's river boat casino. Defendant Grand Victoria now moves for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) on all remaining claims. Because we find that there are material facts which remain in dispute, that motion is denied.

## BACKGROUND

Defendant Elgin River Boat Resort–River Boat Casino (d/b/a Grand Victoria Casino) operates a gaming casino aboard the vessel M/V Grand Victoria on the Fox River in Elgin, Illinois. Plaintiff began working for Grand Victoria in September 1994 as a "slot floor person." As such, her duties included customer service, paying jackpots, minor service on the slot machines, and performing "hopper fills."

Because plaintiff was injured during a hopper fill and allegedly reinjured during a "secondary hopper fill" it is worth describing these procedures. When a slot machine has no more coins in its hopper, the machine will flash a code in its window indicating that a hopper fill is necessary. Grand Victoria procedure requires the slot floor person on duty to first open the machine door with the appropriate key to confirm that the hopper is empty and to make an appropriate entry in a log book. The employee then places his or her name tag on the machine to alert other employees that the "problem" with the machine is being addressed. After closing the machine, the employee proceeds to a coin booth for the appropriate change. Upon returning to the machine with a sealed bag of money, the employee reopens the machine, makes another entry in the log book, and then radios the security and surveillance departments (on separate channels) to identify the machine number and report that a hopper fill is about to be performed. The employee then cuts open the bag and waits for the security guard to arrive before filling the hopper. Company policy requires that a security guard actually witness the employee pouring the coins into the machine. For a two-week period, April 17–May 1, 1995, Grand Victoria tested a new procedure whereby a guard would accompany the slot floor person from the coin booth to the machine for the hopper fill. According to the assignment memo, the new procedure was designed to expedite hopper fills, decrease waiting time, and to eliminate radio traffic on the security channel.

There are two types of slot machines aboard the Grand Victoria. The "upright" machine has a door which swings open from right to left on a vertical hinge on the left side of the machine. The "slant top" machine has a door at the top which swings up on a horizontal hinge at the back of the machine. On the slant-top machine, there is a support arm that locks the open door and a damper that serves as a shock-absorber for the door, allowing it

to close slowly. On the "upright" machine there is no lock or damper, but there is a cable that restricts the door from opening much more than 90 degrees. Many of the slot machines also have a "secondary hopper" compartment located underneath the standard hopper. This locked compartment can be used to store additional bags of money to alleviate the need for slot floor personnel to make separate trips to the coin booth when a hopper fill is necessary. Filling the secondary hopper requires opening the machine door, kneeling or squatting on the ground and placing the bags, each weighing approximately 25 pounds, into the lower compartment.

On May 9, 1995, Moreno was "flagged down" by a female patron after her slot machine had run out of coins during a payout. Moreno observed the appropriate code flashing and asked the patron if she could examine the machine to confirm that it was out of money. The patron initially refused, and plaintiff explained that it was not her intention to "fix the machine so it would stop paying out jackpots" but rather that she could not pay out the money won by the patron unless she refilled the machine. The patron acquiesced and moved away from the machine so that Moreno could open the door. Moreno then followed company procedure and upon returning to the machine with the required coins, noted that the patron was playing the "wild cherry" game two machines down the aisle. Plaintiff reopened the machine, made the entry in the log book, and called security to ask that a guard meet her at the machine so she could complete the fill.

The parties quibble over the subtleties of what happened next but both rely on Moreno's deposition testimony. According to her deposition, as Moreno stood with the bag of dollar coins ready to pour, "the patron notices that I'm back in the machine and she lunges from here to the door (indicating) and slams it on me and tells me to get out" (Moreno dep. at 79). Later, Moreno described the woman as "crazed," "that she went bananas," or was a "little schizo." Moreno testified that "[s]he pushed the door on me" with considerable force (*id.* at 80, 82), though plaintiff now suggests that the patron may not have deliberately hit her with the door. In any case, the impact caused Moreno to cut her arm on the door latch and caused her body to twist such that the inside of her right knee hit the coin tray on the bottom of the machine. Moreno contends that she would not have been injured if the doors on the upright slot machines were fitted with the same sort of damper that exists on the slant top machines.

Following her injury, Moreno was sent by defendant to Sherman Benefit Manager. The examining physician, Dr. Powers, recommended restricted work, including "mostly sitting work," and referred Moreno to Dr. Michael Berkson. On August 3, 1995, Dr. Berkson examined Moreno and filled out an extensive progress report. He noted intermittent knee symptoms, "where something feels like it goes out of place, her knee locks and has pain." After the episodes, he reported, "It then improves over the next several days and near normal.... She has had several episodes of collapsing." The report speculated that Moreno had a "torn medial meniscus" in her right knee, but advised an MRI to aid diagnosis and recommended continued observation before any arthroscopic procedure. Dr. Berkson notified defendant of his opinion and recommendations. *See* Exhibits to Affidavit of Sharon McGill (McGill), human resources manager, defendant's 12(m) statement, tab D. A prescription written that same day by Dr. Berkson indicates: "This patient may return to work on Sunday 8/6. No work restriction needed." Moreno was given an injection of cortisone for her pain.

By June 1996, plaintiff was again having problems with her knee. On June 12, she was again evaluated by Dr. Berkson, who concluded that it was time for an arthroscopic assessment of the knee joint. He noted that "[i]f the condition is one that would resolve on its own over time, it would have gotten better long ago."

Again, defendant was notified of the results of his evaluation, but no work restrictions were communicated.

In August 1996, assistant slot manager John–Martin Meyer (Meyer) was promoted to manager of the slot department. On September 2, Moreno was promoted to slot shift manager. A week and-a-half later, Meyer issued an inter-office memorandum advising that slot floor people would be required to do secondary hopper fills on the slot machines. Several slot floor people complained to plaintiff and other supervisors that doing the secondary hopper fills was too hard because of the strain the task placed on their legs, backs, and arms. They also complained about getting burned with cigarettes from patrons who were gaming in the area, getting hit with machine doors while attempting to fill the secondary hopper, and patrons stepping on their hands while performing this procedure (Moreno dep. at 110). Meyer was aware of these complaints and, in order to determine whether there was cause for complaint, issued an order at the October 9, 1996, department meeting requiring all managers to perform at least twelve secondary hopper fills by October 14, Moreno was concerned about performing these secondary fills because of her knee. She had already begun efforts to schedule her arthroscopic procedure. She reportedly informed shift managers Dixie Winter and Bill Green, and slot manager Dean Bridge that she could not safely perform this task.

According to Moreno, she also went to Meyer's office to inform him that she could not safely perform the secondary hopper fills. Meyer allegedly responded that "everybody is going to do them, and that includes you" (Moreno dep. at 112). Meyer has no recollection of this meeting. Despite her reservations, Moreno completed her twelve fills and, she alleges, further injured her knee in the process.[1] At the October 14, 1996, department meeting, she reportedly told Meyer: "[T]hanks a lot.

My knee is shot." Although Dr. James Hill did not begin treating Moreno until the following spring, he posits in an affidavit that "[w]ith a diagnosis of medial meniscus tear of the right knee, not yet repaired, activities involving squatting, kneeling, bending, climbing, prolonged standing, prolonged walking or heavy lifting greater than twenty-five (25) pounds would have been contraindicated." Grand Victoria asserts that it has no record or knowledge that plaintiff ever made any complaint concerning her inability to perform any tasks she was asked to perform at work. Defendant further notes that at all times after her original injury, light duty employment would have been available to plaintiff upon written request by one of her physicians.

In November 1996, plaintiff underwent partial arthroscopic medial meniscectomy. She remained off work from November 5–17 on the advice of Dr. Berkson. After November 17, Dr. Berkson returned plaintiff to work without any physical restrictions. As of December 11, 1996, he advised Grand Victoria that he expected Moreno's knee to have "near normal function" within six weeks. Plaintiff, however, continued to have problems with her knee. On January 22, 1997, Dr. Berkson advised plaintiff that she should restrict her work schedule to four days a week and that she should consider using an assistive device. Plaintiff informed Meyer and McGill of these recommendations; Meyer approved Moreno's request for the four-day week and for her use of a motorized cart. Apparently, plaintiff reverted to a five-day schedule in February.

Over the next five months there is an undisputed record of plaintiff's ongoing problems with her knee, a second arthroscopic procedure on April 29, another recovery period, and an accommodation of Moreno's physical needs by her employer. The only real dispute regarding the events

---

1. Moreno's testimony on this issue is ambiguous, but she appears to allege that the subsequent diagnosis of torn cartilage is causally related to the secondary hopper fills. Moreno dep. at 113–114.

of this period concerns alleged communications between Meyer and Moreno regarding her surgery, her switch to Dr. Hill, and her work schedule. We will address these later, as necessary.

On July 3, 1997, Moreno was informed by Dr. Hill that she might need a third surgery on her right knee. Dr. Hill gave plaintiff a note continuing her four-day work week restriction and prohibiting "prolonged standing, prolonged walking, squatting, kneeling, bending, climbing, or heavy lifting greater than 25 pounds." Four days later, on July 7, 1997, Moreno communicated this news to Meyer and explained that the procedure would necessarily involve an extended period of recuperation. He was reportedly upset at this news and asked plaintiff, "What do you mean another surgery? How long [will you be off] this time?" She conveyed Dr. Hill's estimate of three to six months and allegedly asked what the best time would be for her surgery, to which Meyer allegedly replied, "It's never a good time." Meyer remembers this event differently and testified that he was not concerned about another surgery because plaintiff's shifts had always been covered when she was off work for medical reasons.

One week later plaintiff was fired. Grand Victoria's motivation for Moreno's termination is hotly contested and remains at the center of this dispute. Grand Victoria maintains that Moreno was fired for her role in an incident that occurred the evening of July 13, 1997, during which a two-year-old child was allowed to enter the Grand Victoria casino and was found sitting with his parents at a slot machine. It is a violation of the River Boat Gambling Act, 230 ILCS 10/11(a)10, for anyone under the age of twenty-one to be in an area of a river boat where gambling is conducted, and a casino found in violation of this statute can be assessed significant fines and penalties. Moreno argues, on the other hand, that her actions were completely appropriate and that her termination on this basis was pretextual. In fact, she alleges, Grand Victoria terminated her because of her disability and in retaliation for her exercise of her legal rights under the Jones Act and general maritime law.

The night the two-year-old boy was allowed to board the Grand Victoria, plaintiff was on duty as a slot shift manager. She was notified via radio by floor person Dan Smallwood that the minor and his parents were on the gaming floor. Working from her electric cart, Moreno moved to their location and found Smallwood and Jeff Thorpe, a temporary assistant slot shift manager, with the parents and the little boy. Thorpe told Moreno that he had called security supervisor Debbie Bakke to advise her of the situation and that a security officer was on his way. Plaintiff then told the minor's parents (who spoke broken English) that they were going to be escorted off the boat because children were not allowed on board. The parents allegedly responded that they did not understand, and that they were going to stay and play. Moreno again informed them that they needed to leave. Security officer Jason then arrived. He called surveillance to advise them that he would be escorting the family off the vessel, which he did. Plaintiff got back into her cart, went around by the main door and saw that the family was properly escorted off the vessel and then returned to her duties.

At approximately 4:30 a.m. the next morning, plaintiff, on her own initiative, wrote out the following statement:

> I was called over to B222 by Dan Smallwood, a floor person where there was a small child maybe two years old, a mother, father (Alice and Jeff) floorpeople. The child was standing on the chair trying to push the buttons again, apparently tells me they were taking turns pushing the buttons. He said he didn't think it was wrong to bring the child on the boat because no one stopped them or even said anything outside when they were in line. Then Jason from Security (Jeff Thorpe had already called them) came and escorted them off the boat. Thank goodness the floorpeople saw the culprit before he actually hit a jackpot.

(Thomason dep., Ex. K at p. 81). At noon, Moreno was called at home by Meyer and told to come to McGill's office to discuss the incident. She reported at 2:00 p.m. and spoke with McGill, Meyer and two other Grand Victoria employees. At 8:00 p.m., plaintiff was told that she would receive a "verbal warning" for her role in the incident and was asked to rewrite the statement leaving off the last line. At 9:15 p.m., plaintiff was again called into the office and was informed by Meyer that she was being terminated. She was told it was because she "dropped the ball" and "didn't follow through." She was given no further explanation. As Moreno was escorted off the ship, McGill reportedly told her that "[i]f [she] got [her] legs fixed [the company] might hire [her] back as a floor person."

General manager Jim Thomason allegedly made the decision to terminate plaintiff based on his own assessment of the child incident and the input of his managers. Thomason felt that plaintiff's response was not sufficiently "immediate" and that the final sentence of her statement was "totally inappropriate" and a "smart aleck comment." Thomason testified that he was particularly concerned with the statement because he had to produce it to the Illinois Gaming Board, and he thought it would reflect badly on the casino that the supervisor of the slot department was making a sarcastic comment about a child sitting at a slot machine. According to defendant, Thomason was aware of plaintiff's knee surgery, but was unaware that the injury was workrelated or that plaintiff may have had rights under the Jones Act in connection with her accident.

Other assessments of Moreno's conduct vary dramatically. According to McGill, her discussions with Moreno suggested that plaintiff knew the seriousness of a child being at a slot machine pushing buttons and that her decision nonetheless to stand by the child and wait for a security guard to come without taking any other action was an insufficient response. McGill wanted to discuss the incident with

Meyer despite the fact that she does not typically get involved with employee disciplinary matters. Meyer testified that he believed Moreno had acted inappropriately, though, according to plaintiff, Meyer did not want her to be fired. Plaintiff also presents the deposition testimony of Joseph Thomas, an agent of the Illinois Gaming Board, who was surprised to learn that plaintiff had been fired. Thomas' official investigation included viewing the surveillance video tapes of the incident and interviewing plaintiff and the other staff involved. It was his impression "[t]hat she had done nothing wrong and ... once she was notified of the incident, she took appropriate action." He testified that he and his colleagues believed that "Ms. Moreno had done everything properly; and that the termination was not necessary."

## STANDARD OF REVIEW

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R.Civ.P. 56(c); *Renovitch v. Kaufman,* 905 F.2d 1040, 1044 (7th Cir.1990). We will make all reasonable factual inferences in favor of the non-moving party. *See Addickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Summary judgment should be granted if it is clear that the plaintiff could not carry her burden of persuasion at trial on one or more elements of her claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

## ANALYSIS

I. *Seaworthiness*

Under the general maritime law ship owners have a duty to provide their crew with a seaworthy vessel. *Mitchell v. Trawler Racer, Inc.,* 362 U.S. 539, 550, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960). The doctrine of unseaworthiness "contemplates that a ship's hull, gear, appliances, ways,

appurtenances and manning will be reasonably fit for its intended purpose." 2 M. Norris, The Law of Seamen, § 613 at 169 (3d ed. 1970 & Supp.1979). Negligent orders, insufficient crew members and assigning too few crew members to a job may deem a vessel unseaworthy, *Mascola v. Pacific Coast Transport Co.*, 421 F.2d 1281, 1283 (2d Cir.1970); *Waldron v. Moore–McCormack Lines, Inc.*, 386 U.S. 724, 87 S.Ct. 1410, 18 L.Ed.2d 482 (1967); *Drachenberg v. Canal Barge Co.*, 571 F.2d 912, 918 (5th Cir.1978); so may a missing or inadequate safety device, *Villers Seafood Co., Inc. v. Vest*, 813 F.2d 339, 342 (11th Cir.1987); *Skipper v. Amerind Shipping Corp.*, 230 F.Supp. 253 (D.La.1964); *Scarberry v. Ohio River Co.*, 217 F.Supp. 189 (D.W.Va.1963); *Havens v. F/T Polar Mist, U.S.C.G.*, 996 F.2d 215 (9th Cir. 1993).

Bemoaning "[d]efendant's congeries of negligent acts," plaintiff argues that the Grand Victoria was unseaworthy because its gaming equipment was unsafe, especially given the volatile combination of alcohol and rowdy passengers; because it was un- dermanned during the period when the guard-escort procedure was discontinued; and because John–Martin Meyer and other supervisors were incompetent.

The primary dispute here concerns the design of the upright slot machines.[2] Plaintiff argues that defendant should have equipped the upright slot machines with a locking support arm or other safety device to prevent the door from being closed on employees working inside. Alternatively, it should have continued the guard-escort procedure to protect employees during hopper fills. She submits the deposition of Larry Lambert, defendant's former slot technician, who testified to the suspicious and often violent reactions of casino patrons, noting that he regularly repaired the glass windows on these machines after they were shattered by angry customers. Lambert also explained that the door on the upright machine has a tendency to swing closed, bumping any employee in its path. He noted that unlike the slot floor personnel doing a hopper fill, his hands were free to help protect him from the swinging door. Lambert also learned to

2. Neither party disputes that admiralty law governs this dispute. Still, we are mindful that this claim sits on the outer perimeter of the purposes to be served by the doctrine of seaworthiness and maritime law generally. As Justice Cardozo explained

> The conditions at sea differ widely from those on land, and the diversity of conditions breeds a diversity of duties.... "The master's authority is quite despotic and sometimes roughly exercised, and the conveniences of a ship out upon the ocean are necessarily narrow and limited." Out of this relation of dependence and submission there emerges for the stronger party a corresponding standard of obligation of fostering protection.

*Cortes v. Baltimore Insular Line*, 287 U.S. 367, 377, 53 S.Ct. 173, 77 L.Ed. 368 (1932) (citations omitted) (quoted in *California Home Brands, Inc. v. Ferreira*, 871 F.2d 830, 836, 1989 A.M.C.2099 (9th Cir.1989)). Where river boat casinos fall within our admiralty jurisdiction, we must apply maritime law to claims that may be better governed by well-developed state tort and products liability law. Employees who return each night to their homes on dry land, who can shop at their own stores, who have access to their personal physicians, who can consult a lawyer or leave their employment at any time do not require the paternalistic standards of care developed for sailors separated from these conveniences and safeguards. Gaming on idyllic waterways does not involve the kind of danger seen by the cargo trade in bygone eras. On the other hand, river boat owners knowingly enter into the Jones Act regime in order to receive the benefit of scarce casino licenses. We are not the first to note these muddy waters, *see King v. President Riverboat Casino–Mississippi, Inc.*, 894 F.Supp. 1008 (S.D.Miss.1995) (declining to find jurisdiction over river boat patron's personal injury suit); *Murky Liability Status sets Waterfront Gambling Adrift*, 11/24/94 Nat'l. L.J. at B1; *see also Foremost Insurance Co. v. Richardson*, 457 U.S. 668, 102 S.Ct. 2654, 73 L.Ed.2d 300 (1982) (requiring sufficient nexus with traditional maritime activity to invoke federal admiralty jurisdiction). But as defendant concedes the court's subject matter jurisdiction, *see* answer at 2, we will proceed to determine whether there is a genuine issue of material fact with respect to whether the design of the upright machines rendered the Grand Victoria unfit for its intended purpose: gaming.

put his shoulder and back to the door so that he would be protected if the door swung toward him. He testified that he knew of upright slot machines manufactured with an additional support arm to keep the door from closing. His testimony also bolsters defendant's position, however, that "most of the upright slot machines in the casino industry are the ones made by IGT" and which are not manufactured with dampers or safety locks on the door.

Plaintiff responds that merely meeting an industry standard is not a sufficient defense. *See Weeks v. Alonzo Cothron, Inc.,* 466 F.2d 578, 582–583 (5th Cir.1972) (unseaworthy practice does not become seaworthy on the basis that it is ratified by custom, usage or tradition within the industry); *Stevens v. Seacoast Co.,* 414 F.2d 1032 (5th Cir.1969) (rejecting argument that radioless oyster dredging vessel was not unseaworthy because vessels of its kind customarily had no radios). Of course, the most colorful statement of this principle appears in Judge Learned Hand's seminal opinion, *The T.J. Hooper,* 60 F.2d 737 (2d Cir.1932). According to Judge Hand:

> [I]n most cases reasonable prudence is in fact common prudence; but strictly it is never its measure; a whole calling may have unduly lagged in the adoption of new and available devices. It never may set its own tests, however persuasive be its usages. Courts must in the end say what is required; there are precautions so imperative that even their universal disregard will not excuse their omission.

*Id.* at 740. Although we see important differences between weather radios for boats at sea and safety latches for slot machine doors, we must leave it to the jury to determine whether the upright machines were "reasonably fit" to permit the seaman to perform her task with reason-

able safety. *See Grillea v. U.S.,* 232 F.2d 919, 922 (2d Cir.1956); *Havens,* 996 F.2d at 218 (upholding bench verdict of unseaworthiness and Jones Act negligence where freezer compartment hatch cover unequipped with safety latch fell on seaman's head and shoulders).

■ We do not believe plaintiff has presented facts to support an *independent* finding of unseaworthiness on the basis that the ship was undermanned or manned by incompetent personnel. The temporary discontinuation of the guard-escort procedure, alone, did not render the ship unfit for gaming.[3] We do not believe that the vessel's seaworthiness was dependent upon a staffing procedure originally designed to reduce fill delays and traffic on secured radio channels. Similarly, we conclude that plaintiff has presented no evidence to suggest that incompetent supervisors rendered the vessel unfit for its intended use. Plaintiff argues that the management team was incompetent because it required employees to conduct hopper fills under unsafe conditions, but defendant has shown that these machines were standard throughout the gaming industry in the midwest and slot machines must be refilled. Thus, the issue here is not the competence of supervisors, it is the design of the doors and the alleged necessity, in light of this design, for additional safeguards such as the guard-escort procedure or dampers.

Finally, Meyer's single instruction to Moreno to perform secondary hopper fills, even if negligent, did not violate the employer's duty to provide a seaworthy vessel. *See Usner v. Luckenbach Overseas Corp.,* 400 U.S. 494, 500, 91 S.Ct. 514, 27 L.Ed.2d 562 (1971) ("To hold that [an] individual act of negligence rendered the ship unseaworthy would be to subvert the fundamental distinction between unsea-

---

**3.** We note that Grand Victoria's procedures allowed plaintiff to wait for security before opening the machine. It is also not clear that the accident would have been avoided had security accompanied Moreno from the change booth. The guard, while present, does not act as a physical shield against the swinging door. Additional personnel may have reduced the likelihood that a patron would respond violently and intentionally shove the door into a slot floor person, but it would not prevent errant bumps.

worthiness and negligence that we have so painstakingly and repeatedly emphasized in our decisions."). While *Mascola, supra,* might suggest a different result, it was decided before *Usner,* and a close reading reveals that the Second Circuit was concerned principally with a finding of negligence under the Jones Act.[4]

## II. *Jones Act Negligence*

When the Jones Act was adopted in 1915 it extended to seamen the right of recovery against their employers that railroad employees already enjoyed. The Act provides that "[a]ny seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury, and in such action all statutes of the United States modifying or extending the common-law right or remedy in cases of personal injury to railway employees shall apply...." 46 U.S.C.App. § 688(a).

■ Under the Jones Act, an employer has a duty to provide a reasonably safe place to work and reasonably safe tools and equipment, *Bailey v. Central Vermont Railway,* 319 U.S. 350, 352–53, 63 S.Ct. 1062, 87 L.Ed. 1444 (1943); *Baltimore & OSWR v. Carroll,* 280 U.S. 491, 496, 50 S.Ct. 182, 74 L.Ed. 566 (1930); a duty to promulgate and enforce safety rules, *Ybarra v. Burlington Northern, Inc.,* 689 F.2d 147, 150 (8th Cir.1982); and a duty to assign workers to jobs for which they are reasonably suited, *Fletcher v. Union Pacific Railroad,* 621 F.2d 902, 909 (8th Cir. 1980). A railroad may be liable under FELA and a maritime employer liable under the Jones Act for failure to provide a safe workplace "when it knows or should know of a potential hazard in the workplace, yet fails to exercise reasonable care to inform and protect its employees." *Gallose v. Long Island R.R.,* 878 F.2d 80, 84–85 (2d Cir.1989), cited in *Syverson v.*

*Consolidated Rail Corp.,* 19 F.3d 824 (2d Cir.1994). Reasonable care is determined in light of whether or not a particular danger was foreseeable. *See Gallick v. Baltimore & O.R.R.,* 372 U.S. 108, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963) ("reasonable foreseeability of harm is an essential ingredient of [FELA and Jones Act] negligence"); *Syverson,* 19 F.3d at 826.

■ We are mindful that courts must "exercise special care in considering summary judgment" in Jones Act cases, given the low evidentiary threshold for submission to the jury. *Lies v. Farrell Lines, Inc.,* 641 F.2d 765, 770–71 (9th Cir.1981); *accord Miles v. Melrose,* 882 F.2d 976, 984 (5th Cir.1989), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 785 (1990) ("A seaman in a Jones Act case has only a 'featherweight' burden of proof") (*quoting Allen v. Seacoast Prods.,* 623 F.2d 355, 360 (5th Cir.1980)); *Petersen v. Chesapeake & Ohio Ry.,* 784 F.2d 732, 740 (6th Cir.1986) (same). Summary judgments "are to be cautiously granted, and 'if there is to be error at the trial level it should be in denying summary judgment in favor of a full live trial.'" *Lies,* 641 F.2d at 772 (citations omitted). Although defendant may be correct that the standard of care— "ordinary prudence under the circumstances"—is no different for employers subject to the Jones Act, *see Gautreaux v. Scurlock Marine, Inc.,* 107 F.3d 331 (5th Cir.1997) (*en banc*), the evidentiary threshold for summary judgment clearly is.

### (a) *Negligence*

■ The parties' principal disagreement regarding the May 9, 1995, incident centers on whether the defendant could reasonably have foreseen that the swinging door on the slot machine could injure an employee conducting a hopper fill, or

---

**4.** Defendant also cites *Rapitis v. Sea–Land Corp.,* 1990 A.M.C. 1501, 1506 (D.Wash. 1990), but the decision was reversed by the Ninth Circuit, which ordered the issues submitted to the jury. 921 F.2d 281, 1991 WL 105 (9th Cir.1991). We think *Usner* governs on the seaworthiness issue but, like the Ninth and Second Circuits, conclude that the negligence claim under the Jones Act is not amenable to summary judgment.

whether the patron's push on the door was an unforeseeable and intervening cause of Moreno's injury.

Plaintiff has introduced ample evidence that the metal doors have a tendency to swing closed (Lambert dep. at 21); that employees are regularly hit by the doors while working inside (Moreno dep. at 90, 97, Biondi dep. at 18–19, Lambert dep., at 21); that employees conducting hopper fills don't have a free hand to protect themselves from the door (Lambert dep. at 26); that patrons are frequently excited, anxious, violent, boisterous, and intoxicated (Thomason dep. at 9–11, Lambert dep. at 17, 20, Biondi dep. at 23–25); that customers are suspicious of employees who must work on machines and some have "grabbed the door" (Lambert dep. at 16, 19–20, Moreno dep. at 74–75); and that shift managers were informed of these problems (Lambert dep at 19).

Defendant contends that the patron "lunged" toward Moreno and "deliberately" pushed the door with such force that it cut plaintiff's arm (Def.mem.at 3 (citing Moreno dep. at 78–79, 80–81)). Because the use of intentional force was unforeseeable, it argues, the employer cannot be liable for the injury. Defendant also argues that an employment relationship between the assailant and the ship owner is essential to a finding of liability under the Jones Act, citing *Corrigan v. Harvey*, 951 F.Supp. 948 (D.Hawai'i 1996) (holding that ship owner was not responsible for an assault on its employee by an angry sailor from another ship). Plaintiff responds to both arguments by directing our attention to *Syverson v. Consolidated Rail Corp.*, 19 F.3d 824 (2d Cir.1994), in which the Second Circuit reversed a grant of summary judgment for the railroad, finding that plaintiff had provided sufficient evidence that the attack on the employee by a knife-wielding stranger in the rail yard was foreseeable. The area on the defendant's premises (where Syverson had been sitting in his parked car doing paperwork) was apparently known to attract vagrants, many of whom were alcoholics or drug addicts.

We are persuaded that *Syverson* is more apt analogy. The court's decision in *Corrigan* rested on the fact that any risk posed by the assailant was not foreseeable to the owner of the vessel, not the fact that the assailant was not a fellow seaman. Moreover, the attack in *Corrigan* happened on the pier and was apparently unconnected to the ship's business. As *the Syverson* court pointed out, the question of foreseeability "is a fact issue, and '[a]s with all factual issues under [these statutes], the right of the jury to pass on this issue must be liberally construed.'" *Id.* at 826 (quoting *Gallose*, 878 F.2d at 85). "[T]he test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played *any* part ... in producing the injury or death for which damages are sought." *Burns v. Penn Central Co.*, 519 F.2d 512, 514 (2d Cir. 1975) (emphasis added); *see also Gautreaux*, 107 F.3d at 336.

Defendant insists that summary adjudication is appropriate here, but among the cases it cites only *Fountain v. John E. Graham & Sons*, 833 F.Supp. 873, 1993 A.M.C.1978 (S.D.Ala.1993), *aff'd* 16 F.3d 1232 (11th Cir.1994) (table), rested on the issue of foreseeability. In *Fountain*, the court granted summary judgment only because there was a "a complete absence of probative facts in support of the seaman's claim on the foreseeability issue." *Id.* at 879 (*citing Dempsey v. Mac Towing, Inc.*, 876 F.2d 1538, 1544 & n. 4 (11th Cir.1989)). There was no evidence that the ship's first captain had notice of any violent propensities on the part of the seaman who lunged at plaintiff in the middle of the night after plaintiff, a fellow seaman, made a racial slur. Here, plaintiff has presented evidence that the casino environment frequently produced violent reactions on the part of patrons concerned about their payoffs when employees opened the slot machines. A reasonable jury could infer that the door design, coupled with such propensities, put Grand Victoria's employees at risk.

■ Alternatively, defendant argues that it was plaintiff's own actions that caused or failed to prevent the injury. "Plaintiff admits that Grand Victoria had a policy requiring employees to call a supervisor in the event of any dispute with a patron on the casino floor. Nevertheless, she did not seek assistance in dealing with the patron or alert anyone else to her presence" (def's reply at 4). Contributory negligence, however, is not a complete bar to recovery under the Jones Act, although it may operate to reduce the amount of the damage award. *See Kopczynski v. The Jacqueline,* 742 F.2d 555, 558 (9th Cir. 1984), *cert. denied,* 471 U.S. 1136, 105 S.Ct. 2677, 86 L.Ed.2d 696 (1985); *Kelley v. Sun Transp. Co.,* 900 F.2d 1027, 1031, 1990 A.M.C. 2209 (7th Cir.1990). The parties' respective roles in the May 9, 1995, accident must be determined by the trier of fact.

### III. *Negligent Assignment*

■ In October 1996, Moreno was ordered to perform twelve secondary hopper fills, allegedly over her objections. She claims the assignment was unreasonable and negligent given her injured knee, which, she alleges, was further damaged when she completed the work order. Defendant makes three interrelated arguments in its opening brief: the task was not "inherently dangerous," citing *Muckleroy v. OPI,* 834 F.Supp. 937 (S.D.Texas 1993); lack of notice; and contributory negligence.[5]

■ As to the first argument, the situation is obviously different from those assignments posing extreme danger to seamen. Moreno was not ordered into a storm, onto a burning vessel, or into a combustion chamber. *See Muckleroy, supra; Meagler v. Wagner,* 1933 AMC 75

(D.Wash.1933); *Tad Jones,* 934 AMC·329 (D.Tex.1934). Defendant is incorrect, however, that the task must be "inherently" dangerous for liability to follow. Instead, the assignment must be assessed with respect to defendant's knowledge, actual or otherwise, of the risk posed to Moreno by the work order. A Jones Act employer owes a duty to assign employees to work for which they are reasonably suited. *See Fletcher v. Union Pacific R.R. Co.,* 621 F.2d 902, 909–10 (8th Cir.1980) (collecting cases). A shipowner breaches that duty if it negligently assigns an employee to perform work beyond his or her capacity. *Id.* The employer is negligent if it knew or should have known that its assignment exposed the employee to an unreasonable risk of harm. *Id.* Where a physician certifies an employee as fit to return to work, it is not the employee's burden to show malpractice by the examining physician; rather, it is sufficient to show that the employer knew or should have known that the employee was unfit for the work because of his condition. *Id.* (citing *Dunn v. Conemaugh & Black Lick R.R.,* 267 F.2d 571, 576 (3d Cir.1959); *Mroz v. Dravo Corp.,* 293 F.Supp. 499 (W.D.Pa.1968), *aff'd,* 429 F.2d 1156 (3d Cir.1970)). Thus, the issue here is whether Meyer knew or should have known that the bending, kneeling, and squatting necessary to complete a secondary hopper fill posed a significant risk to Moreno's knee.

According to defendant's memorandum, at 18–19, "At no time had any of Plaintiff's physicians advised her or Grand Victoria that it would be unadvisable for her to perform such a task.... [N]either Mr. Meyer nor Grand Victoria's Human Resources Department would have had reason to know that the task posed any risk to plaintiff's physical condition." Defendant

---

**5.** In its reply brief, defendant argues for the first time that plaintiff has presented no evidence to show that her condition worsened as a result of the secondary hopper fills. Moreno's 12(n) statement includes only her testimony that after completing the dozen fills she told Meyer, "Thanks a lot. My knee is shot[,]" and documentation that she under-

went arthroscopic surgery shortly thereafter. The record is clear that such surgery had already been recommended. To succeed on this claim, Moreno will have to show that the assignment exacerbated her knee condition. We will not, however, take cognizance of arguments made for the first time on reply.

argues that because of its large employee population it must strictly adhere to its policy requiring physician documentation before making any accommodation, as "it could not logically be expected to keep track of the medical needs and restrictions of its employees" (def. reply at 12). That may be true, but the calculus changes if Meyer *was* aware of Moreno's condition. Otherwise, employers could ignore even obvious limitations while protecting themselves from liability with burdensome bureaucratic requirements. Likewise, where a doctor has not imposed specific work restrictions but common sense would dictate caution, a doctor's silence is not an absolute shield. *See* Fletcher, 621 F.2d at 909. Defendant tries to distinguish *Fletcher* on the basis that the record there included two doctor's notes recommending against heavy labor. The bottom line in *Fletcher*, however, was a remand to the district court for further proceedings on the negligent assignment claim, consistent with the standards presented above. Where the law has been applied to the facts, courts have imposed liability even where an examining physician released the employee as fit for duty. *See, e.g., Mroz*, 293 F.Supp. at 504 (upholding jury verdict of liability despite company doctor's [6] fit-for-duty slip because captains and crew of diesel vessels knew of seaman's emphysema and should have known that work amidst noxious fumes would exacerbate her condition).

With respect to the defendant's final argument, we again note that neither assumption of risk nor contributory negligence is a bar to seaman's recovery under either doctrine of seaworthiness or Jones Act. When plaintiff has been negligent, however, damages otherwise awardable are mitigated in accordance with doctrine of comparative negligence. Federal Employers' Liability Act, § 3, 45 U.S.C. § 53.

IV. *Claims under the Americans with Disabilities Act*

The ADA prohibits covered entities from discriminating against "qualified individual[s] with a disability." 42 U.S.C. § 12112(a). Unlawful discrimination under the ADA includes both discriminatory discharge, 42 U.S.C. § 12112(a), and the denial of employment opportunities based on the need to make reasonable accommodation to the employee's physical impairment, § 12112(b)(5)(a). Plaintiff argues that her termination on July 14, 1997, violated both of these provisions.

To show a violation of § 12112 plaintiff may present direct evidence of discriminatory intent or may employ the indirect, burden-shifting method of proof articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *DeLuca v. Winer Indus., Inc.*, 53 F.3d 793, 797 (7th Cir.1995). Under this latter method, in order to make out her *prima facie* case of wrongful termination, plaintiff must show that (1) she is disabled within the meaning of the ADA; (2) that her work performance met her employer's legitimate expectations; (3) that she was discharged; and that (4) the circumstances surrounding the discharge indicate that it was more likely than not that the disability was the reason for the termination. *Leffel v. Valley Financial Services*, 113 F.3d 787, 794 (7th Cir.1997). Defendant argues that plaintiff is not a disabled individual under the terms of the statute and that in any

---

**6.** The court in *Fletcher* noted that many negligent assignment cases considering a fit-for-duty slip find that the examining physician was an agent of the railroad. The court notes, however, that "such a finding is not essential." *Fletcher*, 621 F.2d at 909 n. 10. Regardless, the parties here include dueling footnotes with respect to Grand Victoria's relationship with Dr. Berkson. Plaintiff alleges that defendant is responsible for any negligence on the part of Dr. Berkson in returning plaintiff to work without restrictions (cplt., ¶ 5; plf. mem. in opp. at 34 n. 2) (citing *Central Gulf Steamship Corp. v. Sambula*, 405 F.2d 291, 302 (5th Cir.1968)). Moreno presents no evidence of an agency relationship, however, as defendant vehemently complains in its reply brief (p.14 n. 34).

case she was fired for a legitimate, non-pretextual reason.

(a) *Disability*

Under the ADA a person is disabled if she can show one of the following sufficient conditions: (1) she has a physical or mental impairment that substantially limits one or more of her major life activities; (2) she has a record of such an impairment; or (3) she is regarded as having such an impairment by her employer. 42 U.S.C. § 12102(2). Plaintiff contends that she meets both the first and third criteria. Grand Victoria disagrees, arguing that plaintiff's knee injury is a temporary impairment, that the impairment does not substantially limit Moreno's ability to perform any major life activity, and that Moreno was not regarded as disabled by Grand Victoria officials.

(i) *Limiting physical impairment*

 Implementing regulations and guidelines promulgated by the Equal Employment Opportunity Commission (EEOC)[7] define "major life activities" as "those basic activities that the average person in the general population can perform with little or no difficulty." 29 C.F.R. Pt. 1630, App. " 'Major life activities' include caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working[,]...sitting, standing, lifting, [and] reaching." *Id.* Such activities are considered "substantially limited" when the person at issue is either unable to perform the activity or is significantly restricted as to the condition, manner or duration for which he can perform these acts, when compared to an average person. 29 C.F.R. § 1630.2(j)(1)(ii); *Roth v. Lutheran General Hospital,* 57 F.3d 1446, 1454 (7th

Cir.1995). In determining whether the disability substantially limits major life activities, the court considers evidence of the nature and severity of the disability, its duration, and whether it will have a permanent or long-term impact. 29 C.F.R. S 1630.2(j); *Homeyer v. Stanley Tulchin Assoc., Inc.,* 91 F.3d 959, 962 (7th Cir.1996). Temporary, non-chronic impairments of short duration, with little or no long term or permanent impact are usually not disabilities. *See Vande Zande v. State of Wis. Dept. of Admin.,* 44 F.3d 538, 543 (7th Cir.1995) (citing *Evans v. City of Dallas,* 861 F.2d 846, 852–53 (5th Cir.1988)). Because plaintiff bears the burden of proof on this issue, in order to survive defendants' summary judgment motion she cannot simply rest on the pleadings, but must point to some affirmative evidence supporting each element of her claim. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Before we turn to the evidence, however, there is new law to consider. In *Sutton v. United Airlines, Inc.,* 527 U.S. 471, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999), the Supreme Court concluded that Congress has not delegated to any agency the authority to interpret the generally applicable provisions of the ADA or, specifically, to interpret the term "disabled." Because the parties in *Sutton* accepted existing regulations as valid, the Supreme Court declined to determine what deference the EEOC "interpretive guidelines" were due. The Court rejected the agency's judgment, however, that "[t]he determination of whether an individual is substantially limited in a major life activity must be made... without regard to mitigating measures such as medicines, or assistive or prosthet-

---

7. Before initiating this lawsuit, Moreno filed a complaint against Grand Victoria with the Equal Employment Opportunity Commission (EEOC) pursuant to Title II of the ADA. The EEOC dismissed the complaint, stating without comment that the "[c]harging party is not a qualified individual with a disability as defined by the ADA," and issued Moreno a right-to-sue notice dated October 31, 1997.

The Commission's decision not to pursue the complaint and its evaluation of Moreno's status are not binding on this court. *See, e.g., Downs v. Massachusetts Bay Transp. Authority,* 13 F.Supp.2d 130 (D.Mass.1998) (concluding that genuine issues of fact existed with respect to whether plaintiff was disabled notwithstanding identical language on notice of dismissal).

ic devices." 119 S.Ct. at 2145 (citing 29 C.F.R. pt. 1630, App. § 1630.2(j) (1998)). The Court concluded that as a matter of law, "corrected" conditions do not fall within the Act's definition of a "disability" as a "physical or mental impairment that *substantially limits* one or more of the major life activities" of an individual. 119 S.Ct. at 2146–2147 (citing 42 U.S.C. § 12102(2)(A) and adding emphasis). Thus, twin flight attendants with severe myopia were not "disabled" once corrective lenses improved their vision to better than 20/20. The Court's opinion leaves open a number of questions, particularly with respect to "mitigating" as opposed to "corrective" measures. The Court did suggest, however, that "individuals who use prosthetic limbs or wheelchairs may be mobile and capable of functioning in society but still be disabled because of a substantial limitation on their ability to walk or run." *Id.* at 2147.

Plaintiff has submitted sufficient evidence on the "temporal" considerations from which a jury could conclude that her knee condition was a long-term disability. She has shown that prior to her termination, her orthopaedic surgeon, Dr. Hill, limited her work week to four days and imposed other *indefinite* medical restrictions, including "no prolonged standing, prolonged walking, squatting, kneeling, bending, climbing, or heavy lifting greater than 25 pounds." CS ¶ 34. Dr. Hill testified that plaintiff "had episodes of buckling and giving way because her knee would slide out of place" (Hill dep. at 23). Dr. Hill also testified that plaintiff "complained of pain on every visit which was functioning—limiting with her. Even in taking care of her normal activities of daily living, she was having problems . . . because of the pain." Temporary "problems" and "episodes of buckling" would not be sufficient to deem Moreno's impairment a disability, but as of July 3, 1997, Dr. Hill had concluded that even surgery was unlikely to significantly improve the "functional" pain which was impeding her "activities of daily living" (Hill dep., at 24). According to defendant's own brief, Dr. Hill's statement

to Sharon McGill, in a letter dated February 6, 1997, that Moreno "had reached maximum medical improvement," meant that ". . . at that point in time she was as good as she was going to possibly get, and as time went on, she was actually going to deteriorate" (def. resp. to plf's mo. for retroactive maintenance and cure, p. 7). Dr. Hill anticipates that plaintiff will require future medical procedures "anywhere from [another] arthroscopy to a total knee [replacement]" sometime within the next ten years (Hill dep., at 25). Ten years is not a "short-term" period.

With respect to the limiting nature of her condition, an "evaluation of work capacity/approval of work" form prepared by Dr. Hill on September 16, 1997, after plaintiff's termination, confirms that plaintiff was to "avoid prolonged standing," "avoid prolonged walking," and with respect to "climbing, jumping, running, stooping, kneeling, crouching, and crawling," plaintiff was "not to do those activities *at all* " (Hill dep., at 42, 43) (emphasis added). The evidence shows that plaintiff continued to use her motorized cart up until her termination, to avoid prolonged walking.

Defendants do not contest that walking, climbing, jumping, running, stooping, kneeling, crouching, and crawling are major life activities. Rather, they argue that the evidence shows that any limitation on these activities "did not rise to the level of a substantial limitation as defined by the ADA." They point to Dr. Hill's finding on March 27, 1999, as reported in another letter to Sharon McGill, that Moreno walked with a normal gait. However, the letter also discloses a new complication arising out of the knee injury and the need for continued treatment and monitoring. It does not lift Hill's earlier restrictions on Moreno's activity. Moreover, activities are considered "substantially limited" when the individual is either unable to perform the activity or is significantly restricted as to the condition, manner or duration for which he can perform these acts as compared to an average person, *see Roth,* 57 F.3d at 1454, and plaintiff's evidence shows

that Dr. Hill prohibited Moreno from performing some of these activities altogether.

We acknowledge that some courts have found no disability on similar (though arguably less severe) facts.[8] Other courts, however, have denied summary judgment where the alleged impairments were apparently less severe than Moreno's.[9] Ultimately, a determination as to whether a person has a disability under the ADA must be an individualized inquiry, *Sutton,* 119 S.Ct. at 2147, and it is not our role on summary judgment to resolve conflicting accounts. Based on testimony by Moreno and Dr. Hill, a reasonable jury could find that Moreno's infirmity was at least indefinite and long-term, if not permanent, and that it substantially limited her ability to walk, run, stand, lift, squat, kneel, bend, and climb.

(ii) *Regarded as Having a Disability*

Alternatively, plaintiff argues that she is a "qualified individual with a disability" because she was "regarded" by her employer as having a disability. As evidence, she points primarily to an alleged statement by Meyer calling her a "crip" and to her supervisor's willingness to accommodate her physical restrictions with a motorized cart and modified work schedule. This is insufficient to meet the "regarded as" prong for a finding of disability. An individual will be "regarded as having a disability" only if the employer has a *mistaken* belief that either (1) a person has a physical impairment that substantially limits one or more major life activities, or (2) the person's actual, non-limiting impairment substantially limits one or more major life activity. *Sutton,* 119 S.Ct. at 2149–50 (citing *School Bd. of Nassau Cty. v. Arline,* 480 U.S. 273, 284, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), and 29 C.F.R. pt. 1630, App. § 1630.2(*l*)). Thus, once plaintiff has argued that her knee impairment substantially limits major life activities, she cannot argue that her employer was mistaken in his belief that she was so limited.[10]

**8.** *See, e.g., Hazeldine v. Beverage Media, Ltd.,* 954 F.Supp. 697, 704 (S.D.N.Y.1997) (finding that obese plaintiff was not substantially limited in a major life activity even though she could not kneel or bend because of her weight); *Williams v. Channel Master Satellite Systems, Inc.,* 101 F.3d 346 (4th Cir.1996) ("[A]s a matter of law, ... a twenty-five pound lifting limitation ... does not constitute a significant restriction on one's ability to lift, work, or perform any other major life activity."), *cert. denied sub nom, Williams v. Avnet, Inc.,* 520 U.S. 1240, 117 S.Ct. 1844, 137 L.Ed.2d 1048 (1997); *Wernick v. Federal Reserve Bank of New York,* 1995 WL 598973 (S.D.N.Y. Oct.10, 1995) (individual's medical restriction of "no prolonged sitting" did not render her disabled under the ADA, as it did not substantially limit any major life activity, including her ability to work), *aff'd,* 91 F.3d 379 (2d Cir.1996); *Smith v. United Parcel Service,* 50 F.Supp.2d 649 (S.D.Texas 1999) (employee's knee injury was not a substantially limiting impairment where physician limited squatting and climbing and prohibited crawling, but where plaintiff's deposition showed that he performs strenuous yard work, climbs three and one-half flights of stairs in one minute, and lifts 70 pounds easily); *Hites v. Patriot Homes, Inc.,* 904 F.Supp. 880, 883–84 (N.D.Ind.1995) (plaintiff's knee injury did not substantially limit major life

activities where, at the time of his physician's deposition, the plaintiff was able to stand, squat, bend, lift 100 pounds and run); *Kelly v. Woodridge Park District,* 1999 WL 203020 (N.D.Ill. March 31, 1999) (employee was not disabled where he sought medical attention for his dislocated knee cap only twice, and within four months after the injury was able to walk, stand, carry up to 50 pounds and drive a motor vehicle without restriction, but one year later was still unable to do repetitive climbing).

**9.** *See, e.g., Aldrich v. Boeing Co.,* 146 F.3d 1265 (10th Cir.1998) (reasonable jury could find disability even before permanent disability rating in light of medical testimony that plaintiff would be unable to do repetitive activities and was a candidate for a surgical procedure to address "flexor tenosynovitis" condition in his forearm); *DiPuccio v. United Parcel Service,* 890 F.Supp. 688, 693 (N.D.Ohio 1995) (summary judgment inappropriate given conflicting medical testimony as to whether plaintiff had "great knees" and could lift 110 pounds, or was in fact unable to perform a significant life activity even after corrective knee surgeries).

**10.** If plaintiff had argued that she was unable to walk or run but that her ability to work

(b) *Circumstances surrounding the discharge*

■ The second and third elements of plaintiff's claim for discriminatory discharge are not contested. Undisputed evidence shows that plaintiff was a valued employee, she received several promotions during the period in question, and had no disciplinary reports prior to her termination (Thomason dep. at 42). Physically, she was able to perform the essential elements of her job with the assistance of the electric cart and a modified work schedule. Predictably, the crux of the parties' dispute is the fourth element, the permissible or impermissible reasons for plaintiff's discharge on July 14, 1997. We conclude that the resolution of this dispute will turn on an evaluation of disputed facts and an assessment of the witnesses' credibility, thus precluding summary judgment at this time. Plaintiff has presented sufficient direct and indirect evidence to take her claim to the jury.

As direct evidence, plaintiff relies primarily on the alleged comment by Sharon McGill, as she was escorted off the boat, that if she "got her legs fixed" she might be rehired as a floor person. It is undisputed that McGill met with Thomason during the hours before he made the decision to let her go, and that McGill recommended that action be taken against Moreno even though she had not viewed a videotape of the event. This is reasonably strong direct evidence, albeit disputed.

Under the *McDonnell Douglas* approach, once plaintiff has made the prima facie showing, the burden shifts to the defendant to articulate a legitimate, non-discriminatory reason for the termination. If defendant can satisfy this requirement, plaintiff may offer evidence that the proffered explanation was merely a pretext to hide a discriminatory discharge.

According to the Grand Victoria, plaintiff's termination was consistent with defendant's reputation for taking a very hard-line position in disciplining employees where possible violations of the Illinois Gaming Act were concerned (Joseph Haughey dep., pp. 29–31). General Manager Thomason testified that plaintiff was terminated because she did not "immediately" escort the two-year-old and his family off the boat and because she included a "sarcastic" comment in her statement about the incident, which he would have to turn over to the Illinois Gaming Board. Defendant suggests that plaintiff's arguments to the effect that her termination was unfair or that other fired employees were more culpable are legally irrelevant. Defendant contends, and has presented evidence to suggest, that plaintiff was fired because of her conduct on January 13, 1997 (a legitimate and non-discriminatory reason to terminate an at-will employee), and not because of her alleged disability.

The burden thus shifts to Moreno to show that this was not the "real" reason for her discharge. Under what standard should we evaluate the employer's motivation here? In *Price Waterhouse,* 490 U.S. 228, 240–41, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the Supreme Court found that the "because of such individual's ... sex" language of 42 U.S.C. § 2000e–2(a)(1), (2), did not mean "solely because of," but was "meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations." The language of the ADA prohibits discriminatory practices "because of the disability of such individual," and thus appears to be amenable to a similar interpretation. *See Hutchinson v. United Parcel Service, Inc.,* 883 F.Supp. 379, 399 & nn. 9, 10 (N.D.Iowa 1995). The Civil Rights Act of 1991 codified the *Price Waterhouse* interpretation of the "because of" language.[11] Although

---

was not substantially limited notwithstanding her employer's mistaken belief, it would have been possible to qualify as "disabled" under both 42 U.S.C. § 12102(2)(A) and (C), at least as a theoretical matter. But as plaintiff has argued that her ability to work *was* signifi-

cantly restricted (plf's mem. in opp. at 40), she cannot qualify under the third prong.

**11.** SEC. 107. CLARIFYING PROHIBITION AGAINST IMPERMISSIBLE CONSIDERATION OF RACE, COLOR, RELIGION, SEX, OR NATIONAL ORIGIN IN EMPLOYMENT

ADA provisions were amended by the same legislation, the discriminatory practices section of the ADA, 42 U.S.C. § 12112, was not revised in the same manner. Did Congress intend for the same standard to apply, or did it's failure to revise the ADA provision indicate otherwise? *See Hutchinson,* 883 F.Supp. at 399 & nn. 9, 10 (identifying question, but declining to decide standards for "mixed motives" ADA claim because plaintiff had no standing as a disabled individual). In *Foster v. Andersen,* 1997 WL 802106, at *6-7 (N.D.Ill. Dec 29, 1997), Judge Aspen outlined the arguments for and against the application of Title VII's mixed motive causation standard to claims under the ADA and concluded that an ADA plaintiff must establish that her disability was "a motivating factor in her employer's adverse action." The Seventh Circuit affirmed, 168 F.3d 1029 (7th Cir.1999), and held that the employer's consideration of the disability must play a "substantial" role in the adverse action to trigger liability under the ADA. Mere awareness of the disability is not enough. Applying this standard in *Foster,* the Seventh Circuit found that plaintiff had failed to create a triable issue concerning whether her request for an accommodation was a motivating factor behind her termination. Foster had been on final warning status, had been warned that a single misstep would result in termination, and admitted that despite the warnings she had been late for work and violated other company policies.

Here, unlike in *Foster,* the plaintiff has presented sufficient evidence regarding the circumstances surrounding the discharge from which a reasonable jury could conclude that it was more likely than not that the disability was a substantial motivating factor in the discharge decision and that Grand Victoria's explanation for the discharge is, at least in part, pretextual. This evidence includes the following: (1) Moreno's termination occurred only one week after she had informed Meyer that she would need additional surgery involving a long recovery period and he was reportedly upset and irritated by this news; (2) the Moreno, Biondi and Thomas depositions suggest that Moreno responded appropriately when learning that a child was in the gaming area; (3) Sharon McGill, who was also aware of the need for a new surgery, was initially only interested in the company's response to Moreno's involvement in the child incident (as opposed to other employees who might have been involved), discussed Moreno's situation with Thomason prior to his decision, recommended that action be taken against employees who were involved, and told Moreno that she might be rehired if she "got her legs fixed"; (4) the disciplinary action could be viewed as disproportionate to Moreno's role in the incident and was apparently not in accordance with the company's "Exception Classifications and Progressive Discipline" policy[12]; (5) plaintiff was told that an appeal would be fruitless; (6) defendant's supervisors were instructed specifically that if an employee inquired about Moreno's termination they were not to discuss it; (7) Moreno was told she was "blackballed" from the Grand Victoria; and (8) Moreno was replaced by Mark McGill, Sharon McGill's husband. We conclude that there is a triable issue of fact as

---

PRACTICES. (a) IN GENERAL.—Section 703 of the Civil Rights Act of 1964 ( 42 U.S.C. 2000e–2) (as amended by sections 105 and 106) is further amended by adding at the end the following new subsection:

　(m) Except as otherwise provided in this title, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

Civil Rights Act of 1991, S 107(a), Pub.L. No. 102–166, 105 Stat. 1071, 1075 (1991) (codified at 42 U.S.C. S 2000a–2(m)).

**12.** Under the policy, "failure to uphold any responsibility within the ICS" is deemed to be a class # 2 exception. The progressive discipline meted out for a class # 2 exception is as follows: 1st offense—verbal warning; 2nd offense—verbal warning; 3rd offense—written warning; 4th offense—written warning; 5th offense—termination.

to whether Moreno's disability, if any, was a "substantial" motivating factor in her discharge.

## V. Wrongful Discharge under General Maritime Law

There are also genuine issues of fact which preclude summary judgment as to whether Moreno's intent to file a personal injury action under the Jones Act played a motivating role in her termination. *See Smith v. Atlas Off-Shore Boat Service, Inc.*, 653 F.2d 1057 (5th Cir.1981) (discharge in retaliation for seaman's exercise of his legal right to file personal injury action against employer constitutes maritime tort); *Bolden v. American Commercial Barge Line Co.*, 1996 AMC 502 (S.D.Ill.1995) (following *Smith* and denying summary judgment given conflicting evidence concerning, *inter alia*, the employer's knowledge of plaintiff's intent to file suit). Defendant maintains that general manager Jim Thomason "did not discuss any legal matters with Moreno or McGill regarding Moreno's injuries" (12(m) ¶ 73), and was unaware of any claims Moreno might have under the Jones Act. Plaintiff, however, has offered evidence that on October 30, 1996, she met with Thomason and human resources manager Sharon McGill in Thomason's office to request that she be paid at her "full salary (rather than a smaller daily amount described as 'Jones Act pay'), while recovering from [her] upcoming [arthroscopic] surgery" (Laurie Moreno aff., filed June 8, 1999). According to Moreno's affidavit, she informed Thomason she was making the request so as to avoid having to get an attorney involved to secure her "full salary." Thomason allegedly replied, "Yeah, I don't like attorneys either," but Moreno was informed that she would be given only "Jones Act pay." *Id.* Thomason testified that he was aware Moreno had eventually retained an attorney. Thomason was also aware that Moreno had undergone surgery and was back to work with the assistance of an electric cart (Thomason dep., at 26–27). On July 14, 1997, McGill, Meyer, and Thomason discussed Moreno, the child gaming incident, and Moreno's continued employment with the Grand Victoria (Thomason dep., at 77, 79). It would be a reasonable inference, though not the only possible one, that Moreno's pursuit of Jones Act remedies played a motivating role in Thomason's decision to discharge Moreno from her employment at the Grand Victoria. On the other hand, a jury well might conclude that even if Thomason was aware of Moreno's ongoing medical expenses and her intent to file suit, he was ultimately motivated only by his fear of significant financial penalties if the Casino did not take severe action against supervisory employees with a role in the "child-gaming" incident.[13] While Thomason may be accused of overreacting under this theory, defendant could not be held liable for an unlawful discharge. The choice between these competing versions, however, is for the trier of fact. Summary judgment is precluded on this issue as well.[14]

---

13. It is undisputed, moreover, that McGill told Moreno her medical expenses and any additional surgeries would still be covered even after her termination (Moreno dep. 157, 164). Given this acknowledgment, a "retaliatory" firing would be illogical.

14. *Folstrom v. Northern Jager Partners,* 1997 WL 824813 (W.D.Wash.), cited by defendants, is readily distinguishable. In *Folstrom,* plaintiff was a seaman who worked under a series of short-term contracts covering each individual fishing voyage. Folstrom apparently had a record of accidents and injuries during his employment with defendant and had sued the defendants in connection with a previous injury. At the conclusion of one voyage in 1995, during which plaintiff was again injured, he was given a poor safety evaluation and consequently placed on the "no rehire list." The seaman learned of the decision six months later and a full year after the accident filed a suit for "retaliatory refusal to rehire." Based on the timing of events which belied plaintiff's theory of the case, and plaintiff's failure to dispute defendants' sworn declarations that they had no knowledge of the seaman's legal intentions when they made the "no rehire decision," the court granted summary judgment for the employers. Here, the timing of the events is somewhat suspect in that the decision to terminate a valued employee came only one week after her announcement of the need for an additional surgery. Moreover, plaintiff has provided affidavits and testimony which corroborate her

*CONCLUSION*

Because we conclude that plaintiff has produced sufficient evidence to create triable issues of fact on material elements of her claims, defendant's motion for summary judgment is denied.

allegation that a meeting took place in the general manager's office specifically to ad-

dress her intention to file (or avoid filing) a Jones Act claim.